# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Midas Life Settlements, LLC,

       Plaintiff,

  v.

BNC National Bank, in its capacity
as trustee of the Norman Murdock 2008
Irrevocable Trust, and Patricia C.
Murdock, as beneficiary of the Norman
Murdock 2008 Irrevocable Trust,

       Defendants.

Patricia C. Murdock, as beneficiary
of the Norman Murdock 2008
Irrevocable Trust,

       Counterclaim Plaintiff,

  v.

Midas Life Settlements, LLC,

       Counterclaim Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 11-841 ADM/AJB

---

Peter A. Bicks, Esq., Stephen G. Foresta, Esq., and Philipp Smaylovsky, Esq., Orrick, Herrington, & Sutcliffe LLP, New York, NY and Clifford M. Greene, Esq., and Sybil Dunlop, Esq., Greene Espel P.L.L.P., Minneapolis, MN on behalf of Plaintiff Midas Life Settlements, LLC.

Richard J. J. Scarola, Esq., and Alexander Zubatov, Esq., Scarola Malone & Zubatov LLP, New York, NY and Scott G. Knudson, Esq., Briggs and Morgan, P.A., Minneapolis, MN on behalf of Defendant Patricia C. Murdock.

---

# I.  INTRODUCTION

On August 23, 2011, the undersigned United States District Judge heard oral argument

on Plaintiff Midas Life Settlements, LLC's ("Midas") Motion [Docket No. 35] for Judgment on

the Pleadings, and Defendant Patricia C. Murdock's ("Mrs. Murdock") Motion [Docket No. 43]

for Judgment on the Pleadings or, in the Alternative, Summary Judgment.  Midas and Mrs.

Murdock have asserted competing declaratory judgment claims under 28 U.S.C. § 2201, seeking

entitlement to the proceeds of a $13 million life insurance policy (the "Policy") issued on the life

of Mrs. Murdock's late husband, Norman Murdock ("Mr. Murdock").  For the reasons set forth

below, Midas' Motion is denied, and Mrs. Murdock's Motion is granted.

## II.  BACKGROUND[1]

In 2005, Mr. Murdock, a retired Ohio legislator and judge, was approached by Don

Schmitt, a longtime friend and insurance broker, about purchasing a life insurance policy as an

investment.  Countercl. [Docket No. 17 at 8] ¶ 7.  Schmitt proposed Mr. Murdock finance the life

insurance premiums with a loan that would not mature for two years, retain the policy until the

loan neared maturation, and then sell the policy to a third party investor in the "life settlements

market"[2] before the loan became due.  Id. ¶ 8.  Schmitt estimated that, after selling the policy and

repaying the loan, Mr. Murdock would net a $900,000 to $1.5 million profit, "all at no or

virtually no cost to Mr. Murdock."  Id. ¶ 9.

In May 2008, Mr. Murdock decided to proceed with this plan.  Id. ¶¶ 10-11.  For tax and

other reasons, he established the Norman Murdock 2008 Irrevocable Trust (the "Trust") to

purchase and retain the Policy and to enter into the necessary financing arrangements.  Id. ¶¶ 12,

---

[1] On a motion for judgment on the pleadings, all facts and inferences must be drawn in favor of the nonmoving party.  Waldron v. Boeing Co., 388 F.3d 591, 593 (8th Cir. 2004).  As both parties have moved for judgment on the pleadings, any disputed facts are noted.

[2] The life settlements market is a secondary market for life insurance policies.  Id. ¶ 8.

16.  The Trust was formed by the Norman Murdock 2008 Irrevocable Trust Agreement (the

"Trust Agreement"), which designates Mrs. Murdock as the Trust's sole beneficiary, BNC

National Bank ("BNC") as trustee ("Trustee"), and Ryan Crayne as the Trust's protector.[3]  Id. ¶¶

14, 17-19, Ex. B (Trust Agreement).

    The Trust applied through The Lincoln National Life Insurance Company ("Lincoln")

and was issued a $13 million universal life insurance policy (the "Policy") on Mr. Murdock's

life.  Id. ¶¶ 24-25.  To finance the Policy premiums and other incidental costs, the Trust entered

into a Financing Facility Agreement ("Financing Agreement") with  CFC of Deleware III LLC

("CFC") and secured a 27-month loan in the amount of $990,857 (the "Loan").  Id. ¶¶ 26, 28, 33,

Ex. C (Financing Agreement).  As part of the financing arrangement, the Trust executed a

Promissory Note for the value of the Loan and granted CFC a security interest in the Policy.  Id.

¶¶ 31-32; Compl. [Docket No. 1] ¶¶ 20, 22.  Mr. Murdock also agreed to personally guarantee

the repayment of approximately $240,000 of the Trust's debt to CFC.  Compl. ¶ 21.

    During 2008 and continuing into 2010, the U.S. economy suffered a recession, and the

life settlements market declined severely.  Countercl. ¶ 34.  By the summer of 2010, it became

clear that Mr. Murdock would be unable to sell the Policy in an amount sufficient to repay the

Loan balance by the August 5, 2010 maturity date.  Id. ¶ 36.  Mr. Murdock faced two options: he

could either retain the Policy by repaying the $1.1 million due under the Loan and making all

future Policy premium payments, or he could transfer the Policy from the Trust to CFC in

exchange for CFC's full forgiveness of the Trust's obligations under the Loan.  Id. ¶¶ 8, 38.  Mr.

Murdock chose to transfer the Policy to CFC to satisfy the Trust's debt.  Id. ¶ 38.  On July 19,

---

[3] The protector's duties include overseeing the purchase and management of the Policy.  Id. ¶ 19.

2010, Mr. and Mrs. Murdock consented to the Policy transfer in an Acknowledgment and Consent by Insured, Insured's Spouse, and Beneficiary (the "Acknowledgment"). Compl. ¶ 26, Ex. C (Acknowledgment). The Acknowledgment includes a provision in which the signatories agree to release CFC and its successors from any claim arising from or related to the transfer of the Policy. Acknowledgment ¶ 2.2.

The terms of the Policy transfer were memorialized in the Delayed Transfer Agreement ("Transfer Agreement"), executed by the Trust and CFC on July 28, 2010. Compl. ¶ 27, Ex. A (Transfer Agreement); Countercl. ¶¶ 39-40. The Transfer Agreement generally provides that, subject to the satisfaction of various terms and conditions, including the conditions that the Loan remain unpaid and Mr. Murdock be alive on September 5, 2010, CFC will accept the transfer of the Policy from the Trust in full satisfaction of the Trust's obligations under the Financing Agreement. Countercl. ¶ 41; Transfer Agreement at 1 (sixth and seventh "WHEREAS" clauses), ¶ 1.1. The Transfer Agreement includes a provision addressing the consummation, or "Closing," of the Policy transfer on a "Closing Date," as well as a termination clause stating the Transfer Agreement "shall automatically terminate if the Insured [Mr. Murdock] dies prior to the Closing Date." Id. at ¶ 5.5.

On September 5, 2010, the Loan had not been repaid and Mr. Murdock was alive. Countercl. ¶¶ 46, 48. Mr. Murdock died unexpectedly on September 11, 2010. Id. ¶ 48. On September 15, 2010, CFC issued a writing to the Trust confirming the Trust's obligations under the Financing Agreement had been satisfied in full. Id. ¶ 51, Ex. E. CFC subsequently assigned its interest in the Policy to another entity, which later transferred the interest to Midas. Compl. ¶ 30.

4

In November 2010, BNC, as Trustee, submitted a claim to Lincoln under the Policy. Countercl. ¶ 53.  Lincoln issued a check to the Trust in the amount of $13,191,283.32 (the "Policy Proceeds").  Id. ¶ 54.  Midas and Mrs. Murdock both claimed entitlement to the Policy Proceeds, and the Trustee refused to release the funds due to the competing demands.   Compl. ¶¶ 34, 41.

On April 5, 2011, Midas filed this action seeking a declaration that the Trust transferred its interest in the Policy to CFC pursuant to the Transfer Agreement before Mr. Murdock died, and thus Midas, as CFC's successor in interest, is entitled to the Policy Proceeds.  Compl. at 12. Mrs. Murdock's Answer asserts a Counterclaim alleging the Transfer Agreement terminated when Mr. Murdock died before the Policy transfer was consummated.  Mrs. Murdock seeks a declaration that the Policy did not transfer to CFC and that she is entitled to the Policy Proceeds as the Trust's sole beneficiary.  Countercl. ¶ 58.

## III.  DISCUSSION

### A.    Legal Standards for Judgment on the Pleadings and Summary Judgment

Midas and Mrs. Murdock both move for judgment on the pleadings.  Federal Rule of Civil Procedure 12(c) provides that a motion for judgment on the pleadings is appropriate after the pleadings are closed.  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings will be granted 'only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law.'"  Waldron, 388 F.3d at 593 (citation omitted).  Additionally, all facts and inferences must be drawn in favor of the nonmoving party.  Id.

Mrs. Murdock moves in the alternative for summary judgment.  Federal Rule of Civil

Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Competing Interpretations of the Transfer Agreement**

**1.  Midas' Position**

Midas argues the Policy transferred from the Trust to CFC on September 5, 2010 pursuant to the Transfer Agreement, which provides, in pertinent part:

> **WHEREAS,** in the event that the Loan is not paid in full prior to September 5, 2010 (such date, the "Transfer Date" and the period between the date hereof and the Transfer Date the "Pre-Transfer Period") and the Insured [Mr. Murdock] is alive at the end of the Pre-Transfer Period, the Lender [CFC] will accept the transfer of the Policy in full satisfaction of the obligations of the Trust under the Financing Agreement, subject to the satisfaction of the terms and conditions hereinafter set forth;
>
> **WHEREAS,** in the event that the Loan is not paid in full during the Pre-Transfer Period and the Insured is alive on the Transfer Date, the transfer of the Policy by the Trust as described herein in full satisfaction of the obligations of the Trust under the Financing Agreement, subject to the satisfaction of the terms and conditions set forth hereinafter, will become effective at the termination of the Pre-Transfer Period.

Transfer Agreement at 1, (sixth and seventh "WHEREAS" clauses).

> Policy and Transfer.  Subject to the satisfaction of the terms and conditions set forth herein, including, but not limited to, the condition precedent that the Loan not have been paid in full during the Pre-Transfer Period and the Insured not have died during the Pre-Transfer Period, Transferor hereby transfers to Lender, and Lender hereby accepts from the Transferor . . . all of Transferor's rights . . . to the Policy, in exchange for the Lender accepting such transfer . . . in satisfaction of the full amount of debt outstanding pursuant to the Financing Agreement (the "Loan Satisfaction").

Id. ¶ 1.1.

Midas contends the Policy transferred on the September 5, 2010 Transfer Date specified in the Transfer Agreement, because at the end of the Pre-Transfer period: (1) the Loan had not been repaid; (2) Mr. Murdock was still alive, and (3) all other conditions precedent had been satisfied.

### 2. Mrs. Murdock's Position

Mrs. Murdock disputes that the Policy transferred, arguing the Transfer Agreement automatically terminated when Mr. Murdock died before the transfer had been consummated – that is, before a Closing had taken place on a Closing Date.  With respect to the Closing and Closing Date, the Transfer Agreement provides:

> Closing and Documentation.  On the terms and subject to the conditions set forth herein, any consummation of the transfer of the Policy contemplated herein (the "Closing") shall take place following satisfaction of the conditions precedent set forth in Section 3 (such date, if any, the "Closing Date") and shall be subject to the satisfaction of the conditions subsequent set forth in Section 3.

Transfer Agreement ¶ 1.2.

Section 3 lists conditions to closing, many which are expressly identified in Paragraphs 3.2 and 3.3 as conditions precedent to closing.  See Id. ¶¶ 3.1-3.3.  The conditions precedent in Paragraph 3.2 ("Paragraph 3.2 Conditions Precedent") must be satisfied before CFC is obligated

7

to consummate the transactions contemplated in the Transfer Agreement and may be waived by CFC "in its sole and absolute discretion in writing." Id. ¶ 3.2. Similarly, the condition precedent in Paragraph 3.3 (the "Paragraph 3.3 Condition Precedent") must be satisfied before the Trust is obligated to consummate the transactions contemplated in the Transfer Agreement, and the Trust may waive the condition in writing. Id. ¶ 3.3.

With respect to the Closing Date, the Transfer Agreement further provides:

> Automatic Termination. This Agreement shall automatically terminate if the Insured [Mr. Murdock] dies prior to the Closing Date.

Id. ¶ 5.5.

Mrs. Murdock insists CFC did not hold a Closing on a Closing Date and that all conditions precedent set forth in Section 3 had not been satisfied before Mr. Murdock died on September 11, 2010.

### 3. Issues Presented

Thus, the pivotal issue is whether a Closing Date occurred before Mr. Murdock died. If it did, the Policy transferred to CFC, Midas' predecessor-in-interest, on September 5, 2010 pursuant to the WHEREAS clauses and Paragraph 1.1 of the Transfer Agreement. If it did not, the Transfer Agreement terminated under Paragraph 5.5, entitled "Automatic Termination." In answering this question, the Court must construe the terms of the Transfer Agreement to determine: (a) whether the Transfer Agreement allows for a silent and automatic Closing Date or, instead, requires a distinct Closing event and Closing Date; and (b) whether the conditions precedent set forth in Section 3 were satisfied or waived before Mr. Murdock died.

### 4. Construing the Transfer Agreement

The Transfer Agreement is governed by Minnesota law. Transfer Agreement ¶ 5.2. In

Minnesota, the construction and effect of a contract are questions of law unless the contract is ambiguous. Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998).  Whether a contract is ambiguous is also a question of law.  Current Tech. Concepts, Inc. v. Irie Enter., Inc., 530 N.W.2d 539, 543 (Minn. 1995).  Ambiguity exists if the contract language is susceptible to more than one reasonable interpretation.  Id.

### a.  Meaning of Closing Date

The parties agree that a Closing Date was required under the Transfer Agreement, but disagree as to the meaning of the term.  The Transfer Agreement states that "any consummation of the transfer of the Policy contemplated herein (the 'Closing') shall take place following satisfaction of the conditions precedent set forth in Section 3 (such date, if any, the 'Closing Date') and shall be subject to the satisfaction of the conditions subsequent set forth in Section 3." Transfer Agreement ¶ 1.2.

Midas contends the Closing Date merely means the date upon which the Closing occurs, which, in turn, happens at the time the conditions precedent set forth in Section 3 are satisfied. Midas urges the Closing and Closing Date took place automatically upon satisfaction of the conditions precedent to closing, and a discrete Closing event on an announced Closing Date was not necessary.  Midas argues the parties' execution of the Acknowledgment, Transfer Agreement and other documents more than a month in advance of the Policy Transfer Date comports with Midas' position that the parties intended and designed the Policy transfer and Closing Date to take place by operation of the Transfer Agreement upon satisfaction of the Section 3 conditions precedent, and that the parties did not intend to hold a Closing event on an announced Closing Date to consummate the transfer.

Mrs. Murdock counters that the language in Paragraph 1.2 stating a Closing "shall take place" negates the proposition that the Closing could occur automatically. She argues the logic of the Transfer Agreement required CFC to give the Murdocks notice of the Closing Date so the Murdocks could fulfill their obligations under the Transfer Agreement of ensuring all representations and warranties remained valid as of the Closing Date. However, Mrs. Murdock's interpretations of "Closing" and "Closing Date" are not reasonable, because they are not supported by the text of the Transfer Agreement. The definitions of those terms contain no language requiring the Closing to be a distinct event or the Closing Date to be held on an announced date. Moreover, the requirement that the Closing "take place" does not prevent the Closing from "tak[ing] place" automatically. Had the parties to the Transfer Agreement intended to impose the Closing and Closing Date obligations urged by Mrs. Murdock, they would have included them among the Transfer Agreement's numerous and detailed terms. Such obligations are not supported in any way by the text of the Transfer Agreement, and the Court will not rewrite the agreement to include requirements not expressly agreed to by the contracting parties. Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 516 (Minn. 1997) ("When the parties' intention is totally ascertainable from the written contract, there is no room to construe the contract differently and this court will not remake the contract.").

Accordingly, under the unambiguous language of the Transfer Agreement, "Closing Date" simply means the date on which the conditions precedent set forth in Section 3 are satisfied. Transfer Agreement ¶ 1.2.

### b.  Satisfaction of Section 3 Conditions Precedent

The parties also dispute the date on which the conditions precedent set forth in Section 3

10

were satisfied.  Midas urges all conditions precedent had been satisfied on or before September 5, 2010.  Mrs. Murdock contends the Section 3 conditions precedent were not satisfied when Mr. Murdock died on September 11, 2010, because a written loan satisfaction was a Section 3 condition precedent and was not provided until September, 15, 2010, and because several Section 3 conditions precedent favoring Midas had not been satisfied or waived before Mr. Murdock died.

### i. Loan Satisfaction Letter

Mrs. Murdock argues CFC's provision of a written loan satisfaction was a Section 3 condition precedent that was not provided until September 15, 2010, meaning that the Closing Date could not have occurred before then.  In asserting the written loan satisfaction was a condition precedent, Mrs. Murdock relies on a Letter of Direction from the Trust's Protector describing the written loan satisfaction as the "sole consideration" for the Policy transfer. Scarola Decl. [Docket No. 46] Ex. B ("Letter of Direction") ¶ (i).  She also cites to Paragraph 2.29 of the Transfer Agreement, which states: "Adequacy of Consideration.  Transferor acknowledges and agrees that, if the Closing Date occurs, the Lender's deeming the obligations of the Trust under the Financing Agreement satisfied in full, which the Lender will acknowledge in writing to the Transferor, is fair, reasonable and adequate consideration to the Transferor for the transfer of the Policy to Lender."

However, the written loan satisfaction is not expressly listed as a "condition[] precedent set forth in Section 3" and thus is not a condition required to be met before Closing.  See Transfer Agreement ¶ 1.2 (stating any Closing "shall take place following satisfaction of the conditions precedent set forth in Section 3").  Had the parties intended the written loan

11

satisfaction to be a condition precedent to the Policy transfer, they would have included it among the express conditions precedent in Section 3, rather than placing it among the representations and warranties set forth in Section 2.  Moreover, that the written loan satisfaction constituted the sole consideration for the transfer does not impact when it was to be tendered or require it to be provided before the Policy transfer.  Accordingly, the written loan satisfaction is not a condition precedent set forth in Section 3.

### ii.  Paragraph 3.2 Conditions Precedent

Mrs. Murdock also disputes Midas' contention that the Paragraph 3.2 Conditions Precedent – which are among the Section 3 conditions precedent to Closing – had been satisfied on September 5, 2010.  She identifies a number of Paragraph 3.2 Conditions Precedent she argues CFC had not determined to be satisfied or waived by this date or before Mr. Murdock's death.  These include the conditions precedent that:  CFC had received the results of lien searches with respect to the Trust and the Transferor, along with evidence all non-permitted encumbrances had been released or terminated, id. ¶ 3.2(i); CFC had received evidence to its satisfaction that all amounts owed by the Trust under the Disclosed Contracts had been, or simultaneously would be, paid in full, id. ¶ 3.2 (m); CFC had verified, to its satisfaction, all material information relating to the Policy and the consummation of the transactions contemplated by the Transfer Agreement, id. ¶ 3.2 (n); and CFC had confirmed that the life expectancy reports delivered to it in connection with the Transfer Agreement were true and correct copies of properly issued reports from providers acceptable to CFC.  Id. ¶ 3.2(q).  Mrs. Murdock argues Midas has offered no evidence to establish the dates on which CFC received or verified the required information and determined such information was satisfactory.  She

contends Midas must produce documentation or other evidence showing the particular date a relevant decisionmaker at CFC concluded that all Paragraph 3.2 Conditions Precedent had been met.  Mrs. Murdock urges Midas is not allowed, after the fact of Mr. Murdock's death, to retroactively and randomly select the date that suits Midas' needs as the date when the Paragraph 3.2 conditions were fulfilled.

Midas raises several arguments in opposition.  First, Midas argues Mrs. Murdock's pleadings do not allege the Paragraph 3.2 Conditions Precedent remained unsatisfied.  Pl.'s Reply Mem. at 8.  However, the Counterclaim alleges the Closing Date "would only happen after satisfaction of various conditions set forth in Section 3 of the Transfer Agreement," Countercl. ¶ 42, and that for the reasons specified "and other reasons, as of the date of Mr. Murdock's death – September 11, 2010 – the transfer of the Policy had not yet been consummated."  Id. ¶ 52.  Thus, Mrs. Murdock's pleadings adequately allege that unfulfilled Paragraph 3.2 Conditions Precedent prevented the Policy transfer from being consummated and the Closing Date from occurring before Mr. Murdock died.

Second, Midas argues the issue of whether or when the Paragraph 3.2 Conditions Precedent were fulfilled is immaterial to this dispute, because satisfaction of the Paragraph 3.2 Conditions Precedent merely obligates Midas under the Transfer Agreement, and Midas is not seeking to enforce its own obligation.  Pl.'s Reply Mem. at 8-9.  However, the issue of whether the Paragraph 3.2 Conditions Precedent were satisfied is not only material, but also essential to determining when the Closing Date occurred, which in turn dictates whether the Transfer Agreement terminated upon Mr. Murdock's death.

Third, Midas insists that Mrs. Murdock cannot cite a condition precedent of the Transfer

Agreement that was not satisfied on or before September 5, 2010, and so the Closing Date and the Transfer Date occurred simultaneously.  However, as the party seeking to enforce the Transfer Agreement, Midas bears the burden of establishing that the terms and conditions required to transfer the Policy have been satisfied.  See Lapp v. Loufek, 113 F.Supp. 65, 68 (D. Minn. 1953) ([P]laintiff has the burden of establishing the contractual terms under which she seeks a declaration of rights.").  Moreover, in the Eighth Circuit, the burden of proof in a declaratory judgment action "rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action.  It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side." Am. Eagle Ins. Co. v. Thompson, 85 F.3d 327, 331 (8th Cir. 1996).  Here, Midas argues for the affirmative on the question of whether all conditions precedent set forth in Section 3 have been satisfied.  Accordingly, though Mrs. Murdock is in the procedural posture of plaintiff in her declaratory judgment Counterclaim, the burden of proof principles are not altered.  See id. at 331-32 ("We see no reason to deviate from [state law] burden of proof principles simply because this action was brought . . . under the federal Declaratory Judgment Act.").  Requiring Midas to bear the burden of proving the Paragraph 3.2 Conditions Precedent were satisfied also prevents Mrs. Murdock from having to prove a negative.  See Terra Indus., Inc. v. Nat'l Union Fire Ins. Co., 383 F.3d 754, 760 (8th Cir. 2004) (placing burden of proof on party who would not need to prove a negative).  Thus, to enforce its rights under the Transfer Agreement, Midas is required to establish the Paragraph 3.2 Conditions Precedent were satisfied or waived prior to Mr. Murdock's death on September 11, 2010.  Midas has offered no evidence to meet this burden. The sole evidence relied on by Midas in arguing all Section 3 Conditions Precedent had been

satisfied on September 5, 2010 is a document offered by Mrs. Murdock that Midas characterizes

as an "unambiguous admission" the Policy transfer was consummated on that date.  Pl.'s Mem.

of Law in Opp. [Docket No. 51] at 20.  The document is email correspondence dated February 2,

2011 from BNC, as Trustee, to counsel for Mrs. Murdock.  Responding to counsel's query

concerning the basis for the Trustee's belief that the Policy had been surrendered, BNC wrote:

"[i]n the Transfer Agreement there is language referring to September 5, 2010 as the transfer

date.  Accordingly, September 5 would be the date that we would look to as the effective date of

the policy surrender."  Scarola Decl. Ex. Q at 1.[4]  This correspondence relates to the Transfer

Date, as opposed to the Closing Date, and has no bearing on whether CFC had determined before

Mr. Murdock's death that all conditions precedent to Closing had been satisfied.

      Fourth, Midas argues the Paragraph 3.2 Conditions Precedent were satisfied on

September 5, 2010 because the parties to the Transfer Agreement intended the Closing Date and

Transfer Date to be the same date.  Pl.'s Mem. of Law in Opp. at 9-11.  In support, Midas relies

on the following provision:

> in the event that the Loan is not paid in full during the Pre-Transfer
> Period and the Insured is alive on the Transfer Date, the transfer of
> the Policy by the Trust as described herein in full satisfaction of the
> obligations of the Trust under the Financing Agreement, subject to
> the satisfaction of the terms and conditions set forth hereinafter, will
> become effective at the termination of the Pre-Transfer Period [i.e.,
> on September 5, 2010].

Transfer Agreement at 1 (seventh "WHEREAS" clause) (emphases added by Midas).  However,

---

[4] Midas objects to the admissibility of the Scarola Declaration.  See Pl.'s Mem. of Law in Opp. at
15-16.  Exhibit Q is admissible, however, because Midas relied on the exhibit to support its
position.  See Jarobo v. U.S., 158 F.2d 509, 515 (1st Cir. 1947) (finding district court properly
admitted photographs introduced by plaintiff where defendant relied on the photographs to
establish the grounds for his defense).

this provision does not reference a Closing Date, and thus is not evidence that the parties intended the Closing Date and Transfer Date to be the same date. Moreover, Midas acknowledges that "if all conditions precedent set forth in Section 3 of the [Transfer Agreement] were not satisfied on September 5, 2010 (and those that were not satisfied had not been waived), the Closing could not take place on that date. If all of the unsatisfied conditions precedent were then satisfied four days later, the Closing Date would be September 9, 2010." Pl.'s Mem. of Law in Opp. at 11. Extending Midas' logic, if all of the unsatisfied conditions precedent were satisfied seven days later, the Closing Date would be September 12, 2010. Thus, by Midas' own reasoning, the seventh WHEREAS clause does not support Midas' contention that parties intended the Paragraph 3.2 Conditions Precedent to be satisfied on September 5, 2010. Additionally, while Midas repeatedly insists the intent of the parties to the Transfer Agreement was for the Policy to transfer September 5, 2010, the parties' express intent was also for the Transfer Agreement to terminate if Mr. Murdock died before the Closing Date. See Transfer Agreement ¶ 5.5.

Finally, Midas argues CFC was entitled to waive the conditions precedent in Paragraph 3.2, because such conditions existed solely for CFC's benefit. It is true that a party may waive a condition precedent to its performance under a contract when the condition precedent exists solely for the party's benefit and protection. Miracle Constr. Co. v. Miller, 87 N.W.2d 665, 670 (Minn. 1958). However, the Transfer Agreement requires the Paragraph 3.2 Conditions Precedent to be waived in writing, and Midas has provided no evidence that CFC waived the conditions either orally or in writing before Mr. Murdock's death. Without such evidence, CFC's attempt to retroactively waive the Paragraph 3.2 Conditions Precedent cannot succeed,

16

even though those conditions were drafted to operate in CFC's favor.  See Crossroads Church v. County of Dakota, 800 N.W.2d 608, 616 (Minn. 2011) (rejecting plaintiff's assertion that it had acquired equitable title under a purchase agreement before July 1, 2008, because plaintiff failed to provide evidence that unfulfilled conditions precedent in the plaintiff's favor had been waived by the plaintiff on or before that date).

In sum, the pleadings do not establish the Paragraph 3.2 Conditions Precedent were satisfied or explicitly waived (i.e., that a Closing Date occurred) before Mr. Murdock died. Thus, Midas cannot show it is entitled to judgment as a matter of law, and its Motion is denied. Additionally Midas bears the burden of proving the Closing Date occurred before Mr. Murdock died, and Midas has presented no evidence of specific facts that would demonstrate when the Closing Date occurred.  Because Midas has failed to raise a genuine issue of material fact for trial, Mrs. Murdock's Motion is granted.  See Krenik, 47 F.3d at 957 (a party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.").[5]

## C.    Attorney Fees

Mrs. Murdock's Counterclaim includes a request for "fees and costs incurred in

---

[5] Midas also argues Mrs. Murdock, by executing the Acknowledgment, released her right to bring a claim against Midas, as well as her rights to the Policy.  See Acknowledgment ¶¶ 2.1-2.2. A release is valid only if the party executing it received full consideration for its claim.  Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099, 1102 (D. Minn. 1981); Tupper v. Massachusetts Bonding & Ins. Co., 194 N.W. 99, 101 (Minn. 1923).  The consideration must be something of value to which the person executing the contract had no previous right.  Schmitt-Norton Ford, 524 F.Supp. at 1102; Tupper, 194 N.W. at 101.  Mrs. Murdock executed the release in consideration of the Policy transfer and Loan satisfaction that were to take place under the Transfer Agreement.  See Acknowledgment at 1-2 ("WHEREAS" clauses and "NOW, THEREFORE" clause).  The Transfer Agreement terminated with the death of Mr. Murdock. Accordingly, Mrs. Murdock did not receive consideration for her release, and the release is not valid.

connection with this action." Countercl. at 21.  Under Minnesota law, "each party bears [its] own attorney fees in the absence of a statutory or contractual exception." <u>Ly v. Nystrom</u>, 615 N.W.2d 302, 314 (Minn. 2000).  Mrs. Murdock has not provided a contractual or statutory basis for recovering her fees and costs in this action.  Accordingly, the request for fees and costs is denied.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Midas' Motion for Judgment on the Pleadings [Docket No. 35] is **DENIED**, and Defendant Murdock's Motion for Judgment on the Pleadings [Docket No. 43] is **GRANTED**.  The Policy Proceeds belong to the Trust and its beneficiary and not to Midas.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 20, 2011.

18